**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| WILSON GORRELL, | ) | Case No.: 1:12-cv-00554 - JLT |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING DEFENDANTS' MOTION |
| | ) | FOR SUMMARY JUDGMENT |
| v. | ) | |
| | ) | (Doc. 79) |
| THOMAS C. SNEATH, et al., | ) | |
| | ) | ORDER DENYING AS MOOT PLAINTIFF'S |
| Defendants. | ) | MOTION REGARDING EXPERT TESTIMONY |
| | ) | AND DEFENDANTS' MOTION TO STRIKE |
| | ) | PLAINTIFF'S EXPERT |
| | ) | |
| | ) | (Docs. 71, 84) |

Thomas Sneath; Hasmukh Shah; and National Toxicology Laboratories, Inc. (collectively, "Defendants") seek summary judgment, or in the alternative summary adjudication, in this action for professional negligence and defamation.  (Doc. 79).  Wilson Gorrell ("Plaintiff") did not file an opposition to the motion.  For the following reasons, Defendants' motion for summary judgment is **GRANTED.**

**I.      PROCEDURAL HISTORY**

Plaintiff, an inmate currently incarcerated at Federal Satellite Low in Jesup, Georgia, initiated the action by filing a complaint against National Toxicology Laboratories, Inc. ("National Toxicology") and two of its employees on March 9, 2012.  (Doc. 1).  Plaintiff alleged that medication he was taking caused his urine specimen to test positive for cannabinoids in a Gas Chromatography and Mass

1

1    Spectrometry ("GC/MS") test performed at National Toxicology.  (*Id.* at 1).  According to Plaintiff,

2    Defendants "failed to adhere to strict and exacting requirements for testing before certifying a specimen

3    as positive for illicit drug use" and incorrectly informed Federal Satellite Low that his medication had

4    no effect on the positive result.  (*Id.* at 3).  Plaintiff asserted Defendants were liable for several torts

5    including negligence, intentional infliction of emotional distress, breach of contract, breach of fiduciary

6    duty, defamation, libel, slander, and personal injury.

7            On April 10, 2012, the action was transferred from the Southern District of Georgia to the

8    Eastern District of California (Doc. 3), thereby initiating the action before this Court.  Because Plaintiff

9    requested to proceed *in forma pauperis*, the Court screened Plaintiff's complaint pursuant to 28 U.S.C.

10   § 1915 to determine whether he stated cognizable claims on April 27, 2012.  (Doc. 3).  The Court

11   determined Plaintiff stated cognizable claims for negligence and defamation only, and he informed the

12   Court that he wished to proceed on these clams on May 9, 2012.  (Doc. 10).  Defendants filed their

13   answer to the complaint on August 6, 2012.  (Doc. 18).

14           Defendants filed a motion for summary judgment on May 30, 2013.  (Doc. 51).  Plaintiff filed

15   evidentiary objections to the motion, seeking to strike the testimony and report of Defendants' retained

16   expert witness, Dr. Darrell Clardy, and to strike the testimony of the non-retained experts, defendants

17   Thomas Sneath and Hasmukh Shah.  (Doc. 55).  Further, Plaintiff requested the Court exclude the

18   contract between National Toxicology and the Bureau of Prisons from evidence.  (*Id.*)  At a hearing on

19   July 3, 2013, the Court explained Plaintiff was a pro se prisoner who was entitled to receive a warning

20   explaining the requirements for opposing the motion for summary judgment pursuant to *Rand v.*

21   *Rowland,* 154 F.3d 952 (9th Cir. 1998) and *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

22           Although Defendants motion for summary judgment was withdrawn, the Court addressed the

23   issues in Plaintiff's motion to strike, and set a briefing schedule for Defendants to have an opportunity

24   to oppose the motion. (*See* Doc. 61).  The Court found Dr. Clardy possesses the "knowledge, skill,

25   experience, training, [and] education" to qualify as an expert pursuant to Rule 702, and his report

26   satisfied the requirements of Rule 26(a).  (Doc. 63 at 4, 7).  In addition, Plaintiff's requests to strike the

27   testimony of Defendants Sneath and Shah, and to exclude the contract were denied.  (Doc. 82).

28           On August 22, 2013, Defendants filed their second motion for summary judgment, which is

1    now pending before the Court.  (Doc. 79).  The same date, Defendants served Plaintiff with a *Rand*

2    warning.  (Doc. 79-1).  In spite of receiving the *Rand* warning, Plaintiff did not file an opposition to the

3    motion for summary judgment.  The Court found the matter suitable for decision without oral

4    arguments of the parties, and the matter was taken under submission pursuant to Local Rule 230(g).

5    **II.      STANDARDS FOR SUMMARY JUDGMENT**

6              The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to

7    see whether there is a genuine need for trial."  *Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,

8    475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no

9    genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

10   R. Civ. P. 56(a).  Accordingly, summary judgment should be entered "after adequate time for discovery

11   and upon motion, against a party who fails to make a showing sufficient to establish the existence of an

12   element essential to that party's case, and on which that party will bear the burden of proof at trial."

13   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

14            In addition, a court may grant summary adjudication, or partial summary judgment, when there

15   is no genuine issue of material fact as to a particular claim or portion of that claim.  Fed. R. Civ. P. 56;

16   *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981).  The standards that apply on

17   a motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R. Civ.

18   P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

19            A party seeking summary judgment bears the "initial responsibility" of demonstrating the

20   absence of a genuine issue of material fact.  *Celotex,* 477 U.S. at 323.  An issue of fact is genuine only

21   if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact

22   is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty*

23   *Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir.

24   1987).  The moving party demonstrates summary judgment is appropriate by "informing the district

25   court of the basis of its motion, and identifying those portions of the pleadings, depositions, answers to

26   interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates

27   the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323 (citation omitted).

28            If the moving party meets its initial burden, the burden shifts to the opposing party to present

1   specific facts that show there is a genuine issue of a material fact.  Fed R. Civ. P. 56(e); *Matsuhita*, 475

2   U.S. at 586.  An opposing party "must do more than simply show that there is some metaphysical doubt

3   as to the material facts." *Id.* at 587.  The party is required to tender evidence of specific facts in the

4   form of affidavits, and/or admissible discovery material, in support of its contention that a factual

5   dispute exits. *Id.* at 586, n.11; Fed. R. Civ. P. 56(c).  Further, the opposing party is not required to

6   establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual

7   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."

8   *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).

9   However, "failure of proof concerning an essential element of the nonmoving party's case necessarily

10  renders all other facts immaterial." *Celotex*, 477 U.S. at 322.

11          In resolving a motion for summary judgment, the Court examines the evidence provided by the

12  parties, including pleadings depositions, answer to interrogatories, and admissions on file. *See* Fed. R.

13  Civ. P. 56(c).  Even if a motion for summary adjudication is unopposed, a court cannot grant summary

14  judgment solely because no opposition has been filed. *Cristobal v. Siegel*, 26 F.3d 1488, 1494-95 &

15  n.4 (9th Cir. 1994).  The Court must apply standards consistent with Rule 56 to determine whether the

16  moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a

17  matter of law. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).

18  **III.    UNDISPUTED MATERIAL FACTS**

19          **A.      Contract between National Toxicology and the Bureau of Prisons**

20          Defendant National Toxicology Laboratories, Inc. ("National Toxicology") entered into a

21  contract with the Bureau of Prisons in March 2007.  (Doc. 79-9).  Pursuant to the terms of the contract,

22  National Toxicology was to maintain Department of Health and Human Services/ Substance Abuse and

23  Mental Health Services Administration ("HHS/SAMSHA") certification "to provide confirmation

24  testing for positive on-site urinalysis ups, submitted by the Bureau of Prisons ("BOP") using HHS/

25  SAMSHA certified gas chromatography/mass spectrometry… confirmation methods" for such as THC,

26  the primary metabolite of marijuana.  (Doc. 79-9 at 8).   In requesting a drug test, the BOP would

27  provide a "Chain of Custody" form for each urine sample, included an identification number, the test

28  requested, the test reason, and collection date.  (*Id.* at 17).  Even if the "Chain of Custody" form was

1    incomplete, National Toxicology was directed to complete testing on the sample sent; if a test was not

2    specified on the form, the laboratory was to test for all substances covered by the contract.  (*Id.* at 19).

3           On December 4, 2007, the THC detection cut-off level under the contract was amended.  (Doc.

4    79-9 at 35-36).  Under the amendment, National Toxicology was required to report as "positive" any

5    sample tested via the GC/MS process if the amount of THC was "equal to or exceeding" 4 ng/ml.

6    (UMF 13, 15; Sneath Decl. ¶ 11; Doc. 79-9 at 36).

7           **B.       Plaintiff's drug test**

8           As part of a random drug test at Federal Satellite Low facility, Plaintiff submitted a urine

9    sample to the BOP in June 2011.  (Doc. 79-4, UMF 9).  The sample was screened by the BOP staff in

10   Jesup, Georgia, and was reported to be positive for the presence of THC.  (UMF 10).  As a result,

11   Plaintiff's sample, identified as BOP 0001172242, was sent to National Toxicology for confirmatory

12   testing.  (UMF 16, 17).  National Toxicology received the sample labeled BOP 001172242 on June 16,

13   2011.  (UMF 20).  The bag containing the urine sample was inspected for evidence of tampering—

14   none was found—and the seal of the specimen bottle was intact.  (UMF 21, 22).  The sample was

15   identified by National Toxicology as Laboratory Accession Number ("LAN") 110600222.  (UMF 18).

16          Defendant Hasmukh Shah performed a GC/MS test on Plaintiff's urine sample at 11:02 p.m.

17   on June 16, 2011.  (UMF 25; Doc. 79-7 at 22).  The GC/MS test results indicated the presence of THC

18   Metabolite Cannabinoids in the amount of 11.9 ng/ml.  (*Id.*)   On June 17, 2011, Shah informed the

19   BOP that the sample had confirmed as "positive" for THC, and certified the sample was "examined

20   upon receipt, handled and analyzed in accordance with applicable requirements, and that the[] results

21   are for that specimen."  (UMF 26; Doc. 79-7 at 4).

22          After Plaintiff was informed that his test results were confirmed positive for THC, Plaintiff

23   told BOP staff that his prescription medication, Atripla, must have been the reason his urine sample

24   was tested positive.  (UMF 27; Doc. 1 at 2).  Plaintiff expressed his belief that the Atripla caused a

25   false positive, and BOP Senior Officer Goarcke contacted National Toxicology to find out whether the

26   medication could cause a false positive.  (UMF 28; Doc. 1 at 2).  Defendant Thomas Sneath informed

27   Officer Goarcke that the medication would not produce a false positive and confirmed the test results.

28   (UMF 29, 60; Doc. 1 at 2).

### C.      Effect of Efavirenz on drug tests

Efavirenz, an ingredient in Atripla, may cause a false positive or a false negative in "some kinds of initial immunoassay screening tests." (UMF 57; Clardy Decl. ¶7(p), Doc. 79-5 at 13; Doc. 1 at 2). The reason the drug may cause a false positive for THC in a screening, immunoassay test is that its "chemical composition and structure . . . is somewhat close to that of THCA, and this closeness can sometimes cause some immunoassay test to report the two as being equivalent." (Clardy Decl. ¶7(p), Doc. 79-5 at 13)  Notably, an immunoassay test is "not as specific or sensitive as GC/MS analysis when attempting to determine the presence of absence of a specific substance in a urine sample.  False positives and false negatives can regularly occur with immunoassay tests, which is why *confirmation* testing of a sample initially found to be positive for a substance is done with GC/MS analysis as opposed to using an immunoassay test." (Clardy Decl. ¶7(q), Doc. 79-5 at 12)  However, where the GC/MS method is administered properly, the medication will not cause a false positive or a false negative for THC.[1]  (*Id.*; *see also* Doc. 1 at 2) (Plaintiff alleged in his complaint: "It is . . . well know[n] that the GC/MS confirmatory test should be able to distinguish or eliminate the EFAVIRENZ as the cause of a positive result. But only if the testing is administered properly.").

### D.      GC/MS testing

The GC/MS analysis "has long been used to" evaluate whether there is a specific substance, such as THC, in a urine sample.  (UMF 36).  The GC/MS includes two main components, a gas chromatograph and a mass spectrometer.  (UMF 37).  A portion of a sample is injected into the gas chromatograph, where it is transformed from a liquid to a gas.  (UMF 38).  As a gas, the sample is carried through the gas chromatograph.  (UMF 39).  Different substances in a sample travel through the gas chromatograph column at different time intervals, known as the "retention time," based upon their different volatility and solubility.  (UMF 40).  At the end of the gas chromatograph, a detector "measures the various retention times that it took for the compounds to pass through the column, which can provide evidence of the chemical composition of materials present in a tested sample."  (UMF 42).

---

[1] Here, it appears Shah conducted a preliminary immunoassay screen of Plaintiff's sample.  (Sneath Dec ¶ 10; Doc. 79-10 at 4) Defendants do no report the result of this test though Plaintiff has indicated in the past that it yielded a negative result. *Id.*; Doc. 65 at 5, 9.

1    Once through the gas chromatograph, the gaseous molecules continue into a mass spectrometer

2    where the molecules are passed through an ionization source, transforming the molecules into

3    positively charged particles, known as ions.  (UMF 43, 44).  The ions travel through an electromagnetic

4    field that separates and filters the ions based upon their mass and the number or amount of ions of each

5    mass are measured.   (UMF 45, 46).  This information is transmitted to a computer that creates a mass

6    spectrogram.  (UMF 47).  "The mass spectrograph allows an analyst to review the results to determine

7    what substances were present in a specific sample in specific concentrations/ amounts, as various

8    different types of substances measured by a mass spectrometer have different mass spectrogram

9    signatures."  (UMF 48).

10    **E.      The GC/MS equipment at National Toxicology**

11    In April 2011, National Toxicology conducted an Evaluation of the Limit of Detection, Limit of

12    Quantification, and Upper Limit of Linearity on the GC/MS equipment, which "help determine the

13    lowest reliable and detectable limit of the [GC/MS] machinery when testing for cannabinoids."  (Sneath

14    Dec. ¶ 4) (citing Doc. 79-8).  At National Toxicology, the Limit of Quantification, which "measures the

15    lowest concentration of cannabinoids in a sample that can be accurately measured by the GC/MS

16    machinery," is 2 ng/ml.  (*Id.*)  The Upper Limit of Linearity—the highest concentration of THC which

17    can be reliably detected—for the GC/MS machine was 200 ng/ml.  (*Id.*)  To evaluate the "carryover[2]"

18    impact of positive samples, the machines are tested using known-negative and known-positive samples.

19    In April 2011, National Toxicology performed such a test and "a known negative sample was run after

20    [a] known positive sample containing 300 ng/ml of cannabindoids."  (Sneath Decl. ¶ 5).  The known

21    negative sample "was reported by the GC/MS machinery to demonstrate 0.07 ng/ml."  (*Id.*) (citing Doc.

22    79-8 at 49).  Thus, the lab concluded there was "no appreciable or significant carryover effect."

23    (Sneath Decl. ¶ 5)

24    On June 16, 2011, the date Plaintiff's sample was tested, known positive and negative samples

25    were run through the same GC/MS machine used to test Plaintiff's urine sample as part of a calibration

26    process.  Specifically, the machine was calibrated at 6:39 p.m. and 6:45 p.m. after known-positive

27

28    [2] A "carryover effect" is where there contamination from an earlier sample of subsequent samples run on the same machine. (Clardy Decl. ¶7(j)-(l); Doc. 79-5 at 11-12).

7

1  control samples identified as THCMED and THCMED2 were run at 6:35 and 6:41 p.m.  (Clardy Decl.

2  ¶7(f); Doc. 79-5 at 9).  The samples had "known quantities of 15 ng/ml" and the GC/MS results

3  indicated the levels of THC were 15 ng/ml.  (*Id.*)  A known-negative control sample was run at 6.47

4  p.m., and "and the negative sample was found to be below the cut-off of 4 ng/ml."  (*Id.* at ¶¶7(f), (k)

5  (citing Doc. 79-7 at 19).  Finally, a third known-positive control sample was run six samples before

6  Plaintiff's sample was tested.  *Id.* This sample confirmed the machine was still operating correctly.  *Id.*

7  **VI.     DISCUSSION AND ANALYSIS**

8       "Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and

9  federal procedural law."  *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 427 (1996); *see also Erie R.R.*

10  *Co. v. Tompkins*, 304 U.S. 64 (1938).  As a result, the District Court exercising diversity jurisdiction

11  applies the laws of the forum state, including its choice of law rules.  *Conestoga Servs. Corp. v. Exec.*

12  *Risk Indem., Inc.*, 312 F.3d 976, 980 (9th Cir. 2002) (citation omitted).  However, where an action has

13  been transferred from one district court to another, "the choice of law rules that are applied depend

14  upon the nature of the transfer."  *Competitive Techs v. Fujitsu Ltd.*, 286 F. Supp. 2d 1118, 1157 (N.D.

15  Cal. 2003).  Where an action is transferred "[f]or the convenience of parties and witnesses" pursuant to

16  28 U.S.C. § 1404(a), the change in venue "should be, with respect to state law, but a change in

17  courtrooms."  *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964).  As such, the law that would have been

18  applied by the transferring court governs an action transferred pursuant to § 1404(a).  *Id.*; *Ferens v.*

19  *John Deere Co.,* 494 U.S. 516, 525 (1990).  On the other hand, when an action—such as the one now

20  before the Court—is transferred to cure a defect in venue pursuant to 28 U.S.C. § 1406(a), the choice of

21  law of the transferee court is applied.  *Nelson v. Int'l Paint Co.*, 716 F.2d 640, 643 (9th Cir. 1983).

22       As explained by the Ninth Circuit, "In California, courts apply a three-part governmental

23  interest test."  *Estate of Darulis v. Garate*, 401 F.3d 1060, 1062 (9th Cir. 2005) (citing *Arno v. Club*

24  *Med Inc.*, 22 F.3d 1464, 1467 (9th Cir. 1994).  First, the Court must determine whether the foreign state

25  law actually differs from the law of California.  *Id.*  If it does, the Court then "consider[s] each state's

26  interest in having its own law applied to this case to determine whether there is a 'true conflict'

27  between their interests."  *Id.*  Finally, if the Court finds each state has a legitimate interest, the Court

28

8

1    "compare[s] the extent to which each state's interests will be impaired if the other state's law is applied.

2    *Id.* (citations omitted).

3        In this case, the laws of California and Georgia do not differ in the general elements of

4    negligence[3] and defamation.[4]  However, because National Toxicology is located in California, and the

5    alleged professional negligence occurred in California, the Court herein applies California law to

6    discuss Plaintiff's causes of action.  *Cf. Orr v. Bank of Am.,* 285 F.3d 764, 772 & n.4 (9th Cir. 2002)

7    (where the plaintiff was a resident of Nevada, the alleged torts occurred in Nevada, and the defendant

8    bank's branch was located in Nevada, the Court determined it was appropriate to apply Nevada law

9    rather than California law, because California had little interest in having its law applied).

10       **A.    Negligence**

11       In general, to state a cognizable claim for negligence, Plaintiff "must establish four required

12   elements: (1) duty; (2) breach; (3) causation; and (4) damages."  *Ileto v. Glock, Inc.*, 349 F.3d 1191,

13   1203 (9th Cir. 2003).

14                   1.    Duty owed by Defendants

15       "To prevail in an action for negligence, the plaintiff must show that the defendant owed a duty

16   *to the plaintiff*."  *See John B. v. Superior Court*, 38 Cal. 4th 1177, 1188 (2006) (emphasis added).

17   Previously, Plaintiff has asserted that Defendants must comply with the terms of the contract between

18   National Toxicology and the BOP. (*See, e.g.,* Doc. 65 at 7-8).[5]  For example, Plaintiff contended that

19   pursuant to the contract, National Toxicology and its employees had an obligation to test all samples

20   individually and retain any samples confirmed as positive through the GC/MS test "for a period of at

21

22       [3] Pursuant to Georgia law, a plaintiff must show: "a duty, a breach of that duty, causation, and damages" to recover
     for injuries caused by another's negligence. *Johnson v. Am. Nat'l Red Cross*, 276 Ga. 270, 272 (Ga. 2003).  Likewise, under
23   California law, a plaintiff must demonstrate the defendant owed a duty to the plaintiff, the defendant breached that duty, and
     the breach proximately caused the plaintiff injuries. *John B. v. Superior Court*, 38 Cal. 4th 1177, 1188 (Cal. 2006).

24
         [4] Both California and Georgia describe the elements of defamation as requiring a false and defamatory statement
25   concerning the plaintiff made in an unprivileged communication by the defendant, and resulting in special damages.
     *Compare Wertz v. Allen*, 313 Ga. App. 202, 205 (Ga. Ct. App. 2011) *with Taus v. Loftus*, 40 Cal. 4th 683, 720 (Cal. 2007).
26
         [5] Although Plaintiff has not filed an opposition to the motion for summary judgment now pending before the
27   Court, he filed an opposition to the previous motion that was later withdrawn by Defendants. (Doc. 65).  Because the
     arguments raised by Defendants are the same, the Court refers to Plaintiff's previous opposition for the arguments he may
28   have made in opposition the motion now before the Court.

1    least 60 days." (*Id.* at 8). Further, Plaintiff contends the contract required Defendants to "adhere to

2    the Substance Abuse and Mental Health Service Administration ("SAMSHA") guidelines when

3    creating a set of standards and controls on tests." (*Id.*, n.1) (*see also* Doc. 79-9 at 34).

4           Importantly, however, Plaintiff was not a party to the contract between National Toxicology and

5    the BOP. As a result, unless Plaintiff was a third-party beneficiary to the contract, National Toxicology

6    did not have any duties to Plaintiff arising from its contract with the BOP. Under California law, a

7    plaintiff must establish an agreement was made for his benefit to qualify as a third-party beneficiary.[6]

8    *Martin v. Bridgeport Community Assn.*, Inc., 173 Cal.App.4th 1024, 1034 (Cal. App. 2d Dist. 2009)

9    (citing *Schonfeld v. City of Vallejo*, 50 Cal.App.3d 401, 420 (1975)). "The fact . . . that the contract, if

10   carried out according to its terms, would inure to his benefit, is not sufficient to entitle him to enforce

11   it." *Id.* (citing *Jones v. Aetna Casualty & Surety Co.*, 26 Cal.App.4th 1717, 1724-1725 (1994)). Where

12   parties benefit from a government contract, they "are assumed to be incidental beneficiaries, and may

13   not enforce the contract absent a clear intent to the contrary." *See Orff v. United States*, 358 F.3d 1137,

14   1145 (9th Cir. 2004), *aff'd on other grounds*, 545 U.S. 596 (2005) (citing *Klamath Water Users*

15   *Protective Assoc. v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 2000)). Thus, Plaintiff has the burden to

16   demonstrate he is a third party beneficiary to the contract between National Toxicology and the BOP to

17   enforce its terms. Because there is no evidence showing Plaintiff is a third-party beneficiary, National

18   Toxicology and its employees did not have duties arising under the contract *to Plaintiff*.

19          On the other hand, professionals such as Defendants have the duty "to use such skill, prudence,

20   and diligence as other members of [their] profession commonly possess and exercise." *Elcome v. Chin*,

21   110 Cal. App. 4th 310, 317 (Cal. Ct. App. 2003). Accordingly, National Toxicology and its employees

22   had a professional duty to ensure accurate drug testing of the urine samples processed by the

23   laboratory. (*See* Doc. 79-5 at 14-14, Clardy Decl. ¶7(r)). The "Chain of Custody" form indicates that

24   the sample identified as BOP 0001172242 was received by "S. Wells," who placed the sample in

25

26

27        [6] Similarly, under Georgia law, a third party beneficiary only has standing if it "clearly appear[s] from the contract that it was intended for his benefit." *Danjor, Inc. v. Corp. Constr., Inc*., 272 Ga. App. 695, 697, 613 S.E.2d 218

28   (2005). The mere fact that he would benefit incidentally from performance of the agreement is not alone sufficient. *Warren v. Bank of Am.*, 2011 U.S. Dist. LEXIS 55777, *6-8 (S.D. Ga. May 24, 2011).

1    storage for testing.  (Doc. 79-7 at 5-6).  Defendant Shah removed the sample from storage and tested it

2    on the same date.  (*Id.* at 6). The specimen was destroyed by Shah on July 22, 2011.  (*Id.* at 8).

3            Because there is no evidence that Sneath handled Plaintiff's urine sample and Sneath states

4    affirmatively that he did not handle the sample, he could not owe a duty of care to Plaintiff related to its

5    handling or testing.  However, after the report of the positive test was communicated to the BOP, BOP

6    personnel contacted Sneath and reported that Plaintiff was taking medication.  (Clardy Dec ¶ 6(j), Doc.

7    79-5 at 6)  Sneath was asked whether this medication could have caused the sample to provide a false

8    positive. *Id.*  Sneath reported the medication would not produce a false positive. *Id.*  For the same

9    reasons set forth above, Sneath owes the same duty of care as other professionals in the field in this

10   regard.

11           B.      Breach of the duty

12           In his complaint, Plaintiff alleges Defendants failed to properly calibrate the GC/MS machine or

13   indicate the calibration was "verified by the running of controls."  (Doc. 1 at 9).  According to Plaintiff,

14   if his medication could not cause a false positive, Defendants must have mishandled the testing of his

15   urine sample through failing to calibrate the machine or through other samples that were positive for

16   THC having a "carryover" effect upon his sample.

17           Dr. Clardy, who is "regularly involved in personally analyzing urine samples to detect potential

18   drugs of abuse as well as evaluating the work, analysis, and results of other toxicologists" (Doc. 79-5 at

19   2), reviewed the procedures of used by National Toxicology and defendant Shah in calibrating the

20   GC/MS equipment and testing Plaintiff's sample.  Dr. Clardy reports that samples with known-positive

21   amounts of 15 ng/ml THC were run through the GC/MS machine used to test Plaintiff's sample at 6:35

22   p.m. and 6:41 p.m on June 16, 2011, and the results indicated the samples had THC in the amount of 15

23   ng/ml. (Doc. 79-5 at 9, Clardy Decl. ¶7(f)).  A known-negative sample was tested at 6:47 p.m., and

24   determined to be below the BOP cut-off of 4 ng/ml.  (*Id.*)  Dr. Clardy explains that the running of a

25   negative sample immediately following the known-positive samples "is utilized to ensure that there is

26   no potential for a 'carryover.'" (Doc. 79-5 at 11, Clardy Decl. ¶7(k)).  He observes:

27           If the known negative example had revealed the presence of THC[] above the cut-off
             level of 4 ng/ml, the defendants would know that the GC/MS machinery was not
28           operating correctly and that there was the potential that negative samples that were
             analyzed following positive samples could be contaminated in some fashion through

'carryover' from the prior positive sample(s). That did not occur in this case as the known negative sample (TCHNEG) was found to be negative (i.e., below 4 ng/ml) after being analyzed immediately following the two known positive calibration samples through the GC/MS process.

(*Id.*, ¶7(l)).  Dr. Clardy explains that any carryover "would have revealed itself in the THCNEG sample analysis following the TCHMED and THCMED2 sample analyses."  (Doc. 79-5 at 12, Clardy Decl. ¶7(l)).  According to Dr. Clardy, because "the defendants ran a negative control sample following two known positive samples prior to analyzing Mr. Gorrell's sample, and the negative sample was found to be below the cut-off of 4 ng/ml," the rest results "confirm[ed] that the GC/MS machinery was functioning correctly and was properly calibrated."  (Clardy Decl. ¶ 7(f), Doc. 79-5 at 9).

In addition, Dr. Clardy explained it is within the standard of care for a forensic toxicologist and drug analyst to run a sample through a GC/MS machine four-and-a-half hours after calibration.  (Doc. 79-5 at 8-9, Clardy Decl. at ¶7(g)).  As further support for his opinion that the machine was correctly calibrated, Dr. Clardy observed a quality control sample identified as "THCMED3" was run six samples prior to Plaintiff's drug test and "found to be positive within the margin of error."  (*Id.*, ¶ 7(f)) (citing Doc. 79-7 at 13, 21).  For these reasons, Dr. Clardy opined the GC/MS machine was "correctly calibrated" by Defendants prior to testing Plaintiff's sample, and that the sample was tested within a reasonable time from the initial calibration.  (*Id.*)

On the other hand, as Dr. Clardy observes, the known-negative control sample run before Plaintiff's sample, had a detected concentration level of THC of 3.76 ng/ml.  (Clardy Decl. ¶ 7(n), Doc. 79-5 at 12-13).  Thus, the "carryover effect" could not have exceeded that amount. *Id.* Subtracting this amount from the level of THC found in Plaintiff's sample (11.9 ng/ml) still yields a positive result that is double that requiring a positive report to the BOP. *Id.*

Significantly, Defendants have demonstrated that Plaintiff cannot prove that they handled or tested his urine sample properly and Plaintiff has not submitted any evidence to the contrary.  Because Plaintiff has not met his burden to demonstrate Defendants breached their duty of care, he has failed to offer "proof concerning an essential element" of his claim for negligence. *See Celotex*, 477 U.S. at 322.  Accordingly, summary adjudication of his claim for negligence is appropriate, and Defendants' motion is **GRANTED**.

On the other hand, the evidence demonstrates that though the medication Plaintiff was taking could and does cause false positive and false negative results in immunoassay screens, it will not cause a false positive or false negative when the GC/MS testing is conducted properly.  (Clardy Dec ¶ 7(p)-(r), Doc. 79-5 at 13-14)  The evidence set forth above demonstrates that the GC/MS testing was performed correctly, that calibration occurred, that the machine was operating correctly and that the reliability of the results has been assured.  Thus, the Court concludes, Sneath did not breach his duty of care when he reported the medication, taken by Plaintiff at the time he provided the urine sample at issue, did not cause a false positive report.  Therefore, Sneath's motion for summary judgment on this claim is **GRANTED**.

## B.    Defamation

"Defamation is an invasion of the interest in reputation."  *Ringler Associates Inc. v. Maryland Cas. Co.*, 80 Cal.App.4th 1165, 1179, 96 Cal. Rptr. 2d 136 (2000).  To succeed on a claim for defamation, a plaintiff must establish the defendant made "the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage."  *Smith v. Maldonado*, 72 Cal.App.4th 637, 644 (1999) (citing Cal. Civ. Code §§ 45, 46); *see also Taus,* 40 Cal.4th at 720 ("defamation involves (a) a publication that is (b) false, (c) defamatory and (d) unpriveledged, and that (e) has a natural tendency to injure or causes special damages").  Publication of the statement may either be written (libel) or spoken (slander).  Cal Civ. Code §§45, 46.

Here, it is undisputed that defendants Shah and Sneath, as representatives of National Toxicology, made statements regarding the test results of Plaintiff's urine sample identified as BOP 0001172242 and LAN 110600222.  Plaintiff alleged Defendants falsely reported the results of his urine sample as "positive" to the BOP and officers at Federal Satellite Low in Jesup, Georgia both verbally and in writing.  He alleged also that Defendants "did not perform or produce any test reporting to indicate the concentration level (ng/ml) of cannabinoids THC detected in Plaintiff's urine specimen."  (Doc. 1 at 9).  Since then, however, Defendants, have produced evidence indicating Plaintiff's urine sample had the presence of THC in the amount of 11.9 ng/ml. (UMF 25; Doc. 79-7 at 22).  Pursuant to the terms of the contract with the BOP, National Toxicology was to define any sample tested with the GC/MS process with test results indicating the presence of THC "equal to or exceeding" 4 ng/ml as

"positive." (UMF 13, 15; Sneath Decl. ¶ 11; Doc. 79-9 at 36).  Thus, Defendants have established the statements made by Defendants were true that Plaintiff's drug test result was "positive," as defined by the contract with the BOP.

Because the falsity of a statement is an element of defamation, "[i]n all cases of alleged defamation, whether libel or slander, the truth of the offensive statements or communication is a complete defense against civil liability." *Smith*, 77 Cal.App.4th at 646 (citing, *e.g., Campanelli v. Regents of Univ. of California*, 44 Cal. App. 4th 572, 581-582 (1996); *Schmidt v. Foundation Health*, 35 Cal. App. 4th 1702, 1715 (1995); *Ellenberger v. Espinosa*, 30 Cal. App. 4th 943, 953 (1994)).  The defendant has the burden of pleading and proving the truth of a statement, and once the defendant has done so the truth is "an *absolute* defense."  *Id.* (emphasis in original); *Lipman v. Brisbane Elementary School Dist.*,55 Cal. 2d 224, 233 (1961).  Consequently, because the defendants made truthful statements that the urine sample in question was "positive," summary adjudication of this claim is **GRANTED**.

## VII.    CONCLUSION AND ORDER

As set forth above, Defendants have carried their burden to demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323.  Plaintiff has not identified any evidence to show Defendants breached their duty of care in handling and testing his urine sample.  Further, Defendants have demonstrated Plaintiff's urine sample tested for the presence of THC in an amount exceeding the cut-off of 4 ng/ml, which required them to report the sample as "positive."

Based upon the foregoing, it is **HEREBY ORDERED**:

1.    Defendants' motion for summary judgment is **GRANTED**;

2.    Plaintiff's motion for leave of the Court to permit witness testimony by "contemporaneous transmission" (Doc. 71) is **DENIED AS MOOT**;

3.    Defendants' motion to strike Plaintiff's expert (Doc. 84) is **DENIED AS MOOT**; and

///

///

///

///

14

1      4.      The Clerk of Court is DIRECTED to close this action, because this Order terminates

2              the matter in its entirety.

3
IT IS SO ORDERED.
4

5      Dated:    **September 27, 2013**              **/s/ Jennifer L. Thurston**
                                                  UNITED STATES MAGISTRATE JUDGE
6